IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| KELLEY M. KAUFFMAN, | CASE NO. 1:25-CV-00886-DAP |
| Plaintiff, | |
| vs. | JUDGE DAN AARON POLSTER<br>UNITED STATES DISTRICT JUDGE |
| COMMISSIONER OF SOCIAL SECURITY<br>ADMINISTRATION, | MAGISTRATE JUDGE<br>JONATHAN D. GREENBERG |
| Defendant. | **REPORT AND RECOMMENDATION** |

Plaintiff, Kelley Kauffman ("Plaintiff" or "Kauffman"), challenges the final decision of Defendant, Frank Bisignano,[1] Commissioner of Social Security ("Commissioner"), denying her application for a Period of Disability ("POD"), Disability Insurance Benefits ("DIB"), and Medicare Qualified Government Employee ("MQGE") under Titles II and XVIII of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act"). This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before the undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and Recommendation. For the reasons set forth below, the Magistrate Judge recommends that the Commissioner's final decision be VACATED AND REMANDED for further proceedings consistent with this opinion.

## I.  PROCEDURAL HISTORY

In October 2022, Kauffman filed an application for POD, DIB, and MQGE, alleging a disability onset date of July 9, 2021,[2] and claiming she was disabled due to undifferentiated connective tissue disorder

---

[1] On May 7, 2025, Frank Bisignano became the Commissioner of Social Security.
[2] At the hearing, Kauffman amended her alleged onset date to August 1, 2020. (Transcript ("Tr.") 14-15.)

1

("UCTD"), post-COVID long-term sequelae, POTS, brain fog, depression, anxiety, GAD, panic disorder, PTSD, migraines, sinus tachycardia recurrent with near syncope, IBS, excessive daytime sleepiness, OSA, and ADHD.  (Transcript ("Tr.") 14-15, 92.)  The application was denied initially and upon reconsideration, and Kauffman requested a hearing before an administrative law judge ("ALJ").  (*Id.* at 14.)

On December 4, 2023, an ALJ held a hearing, during which Kauffman, unrepresented by counsel, an impartial vocational expert ("VE"), and Kauffman's significant other testified.  (*Id.*)  On January 11, 2024, the ALJ issued a written decision finding Kauffman was not disabled.  (*Id.* at 14-37.)  The ALJ's decision became final on February 24, 2025, when the Appeals Council declined further review.  (*Id.* at 3-8.)

On May 2, 2025, Kauffman filed her Complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 9, 14, 16.)  Reading Kauffman's *pro se* filings liberally, Kauffman presents the following assignments of error on judicial review:

(1)     The ALJ erred in evaluating Kauffman's fibromyalgia, Reynaud's phenomenon, ADHD, and COVID when he found that they were either attributed to UCTD and dysautonomia or not entirely substantiated by objective medical evidence.

(2)     The ALJ erred in finding Kauffman's migraines were a non-severe impairment.

(3)     The ALJ erred at Step Three in evaluating Listing 14.06.

(4)     The ALJ's subjective symptom analysis lacks the support of substantial evidence.

(Doc. Nos. 1, 9, 14, 16.)

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Kauffman was born in July 1987 and was 36 years-old at the time of her administrative hearing (Tr. 14, 36), making her a "younger" person under Social Security regulations.  *See* 20 C.F.R. § 404.1563(c).

2

She has at least a high school education.  (Tr. 36.)  She has past relevant work as a nurse practitioner and registered nurse.  (*Id*. at 35.)

## B.    Relevant Medical Evidence[3]

On January 30, 2017, Kauffman saw Theresa Fenohr, APRN-CNP, for follow up and endorsed joint stiffness, joint swelling, arthralgias, myalgias, malaise, Raynaud phenomenon, dry eyes, and dry mouth, but denied joint deformity, fever, photosensitivity, and dysphagia.  (*Id*. at 995.)  Kauffman also reported associated headaches, but denied facial rash, generalized rash, eye pain, eye redness, visual disturbances, oral ulcers, shortness of breath, and cough.  (*Id*.)  Kauffman complained of chest pain as well.  (*Id*.)  On examination, Fenohr found joint swelling but no erythema, ecchymosis, or deformity.  (*Id*.)  Fenohr further found tenderness to palpation over the bilateral hips and SI joints, right worse than left, but no increased warmth, no click, and no crepitus.  (*Id*. at 997-98.)  Fenohr further found normal movement of extremities, normal stability, and normal muscle strength/tone.  (*Id*. at 998.)  Fenohr noted Kauffman was stable, although Kauffman felt "a little worse as [her] pregnancy progressed."  (*Id*. at 998.)  Fenohr ordered lab work to determine Kauffman's "acute process and stability."  (*Id*. at 998-99.)

On August 21, 2017, Kauffman saw Fenohr for follow up and endorsed myalgias, right shoulder stiffness that radiated to her arm and hand, bilateral hand swelling, and Raynaud phenomenon.  (*Id*. at 983.)  On examination, Fenohr found bilateral hand swelling, but no erythema and no ecchymosis, as well as tenderness to palpation of the bilateral shoulders that radiated into the arms.  (*Id*. at 986.)  Fenohr noted Kauffman was stable and ordered lab work "to assess acute process and stability."  (*Id*. at 989.)

On October 16, 2017, Kauffman saw Fenohr for a flare of her UCTD and endorsed joint stiffness, joint swelling, arthralgias, myalgias, malaise, Raynaud phenomenon, and dry eyes, but denied fever, rash,

---

[3] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

3

eye pain and redness, shortness of breath, cough, and chest pain.  (*Id.* at 977.)  Associated symptoms consisted of headaches.  (*Id.*)  On examination, Fenohr found bilateral hand and finger swelling but no erythema and no ecchymosis.  (*Id.* at 980.)  Fenohr further found tenderness to palpation of the bilateral shoulders, elbows, hands, fingers, knees, ankles, feet, and toes.  (*Id.*)  Kauffman demonstrated normal movement of all extremities, and Fenohr found normal stability and muscle strength/tone.  (*Id.*)  Fenohr noted Kauffman had been stable until a month and a half ago, and Kauffman had not wanted any treatment for past flares.  (*Id.* at 981.)  Kauffman told Fenohr she did not want to take Prednisone at this time, as she was still nursing her baby, but wanted it sent to the pharmacy in the event she decided to stop nursing.  (*Id.*)  Fenohr ordered lab work and told Kauffman she should schedule an appointment with Dr. Kuchynski regarding a treatment plan.  (*Id.*)

On January 17, 2018, Kauffman saw Marie Kuchynski, M.D., for follow up and reported more flares since her last appointment.  (*Id.* at 970.)  Kauffman told Dr. Kuchynski she had needed steroid tapers, and the only time she felt good was when she was on steroids.  (*Id.*)  Kauffman endorsed more Raynaud's attacks that consisted of increased finger swelling and turning.  (*Id.*)  Lyrica helped reduce the intensity of her pelvic pain flares but did not reduce the frequency of them.  (*Id.*)  Kauffman also complained of muscle pain and intermittent eye pain.  (*Id.*)  She denied headaches.  (*Id.*)  On examination, Dr. Kuchynski found Raynaud's phenomenon, finger swelling with mild angulation, no erythema, no ecchymosis, no deformity, no increased warmth, no masses, no clicks or crepitus, positive impingement sign on the right shoulder with rhomboid tightness, and hypermobility.  (*Id.* at 974.)  Dr. Kuchynski noted she would most likely start Plaquenil but would check Kauffman's lab work first.  (*Id.* at 975.)  Dr. Kuchynski continued Lyrica.  (*Id.*)

On April 18, 2018, Kauffman saw Dr. Kuchynski for follow up and reported continued joint swelling, malaise, and dry eyes.  (*Id.* at 964.)  Kauffman told Dr. Kucynski that Plaquenil had caused "severe constipation" and she had stopped taking the medication.  (*Id.*)  Dr. Kuchynski noted that Kauffman was

4

wearing a boot because of an ankle sprain, which Kauffman said was "taking forever to heal." (*Id.*) On examination, Dr. Kuchynski found flattening of one nail on the right hand, no joint swelling, no active synovitis of examined joints, no erythema, no ecchymosis, no deformity, no increased warmth, no masses, no clicks, and no crepitus. (*Id.* at 967.) Dr. Kuchynski prescribed Imuran. (*Id.* at 968.)

On August 8, 2018, Kauffman saw Dr. Kuchynski for follow up and reported worsening symptoms since starting Imuran, with a flare one week after starting the medication that included headache, stiff neck, rash, exfoliating skin on palms, extreme exhaustion, increased sleep, trouble focusing, brain fog, and abdominal cramping. (*Id.* at 958.) On examination, Dr. Kuchynski found flattening of nails, no joint swelling, no active synovitis of examined joints, no erythema, no ecchymosis, no deformity, no increased warmth, no masses, no clicks, and no crepitus. (*Id.* at 962.) Dr. Kuchynski thought Kauffman's symptoms were "partly due to lack of disease control and partly due to medication side effects." (*Id.*) Dr. Kuchynski told Kauffman to stop Imuran and that they would determine her next medication based on her lab work. (*Id.*)

On November 9, 2018, Kauffman saw Dr. Kuchynski for follow up and reported "a lot of issues with fatigue," as well as restless legs, aches all over, generalized rash, and visual disturbances. (*Id.* at 953.) Kauffman denied headaches but endorsed joint swelling, weakness, and malaise. (*Id.*) On examination, Dr. Kuchynski found flattening of nail and pitting, no joint swelling, no active synovitis of examined joints, no erythema, no ecchymosis, no deformity, no increased warmth, no masses, no clicks, and no crepitus. (*Id.* at 956.) Dr. Kuchynski noted that fatigue and abnormal sleep were contributing to many of Kauffman's symptoms. (*Id.* at 957.) Dr. Kuchynski further noted the possibility that Kauffman had Ehlers-Danlos since Kauffman was hypermobile. (*Id.*)

On March 1, 2019, Kauffman saw Dr. Kuchynski for follow up regarding her UCTD and endorsed joint swelling, weakness, malaise, and Raynaud phenomenon. (*Id.* at 948.) Kauffman reported her wrists

5

and joints ached, her toes were cold, and she had been diagnosed with OSA with narcolepsy. (*Id.*) Kauffman told Dr. Kuchynski she was getting a device to treat her OSA and would be undergoing narcolepsy testing once her OSA was better. (*Id.*) Kauffman hoped the OSA treatment would help most of her symptoms. (*Id.*) Kauffman denied headaches. (*Id.*) On examination, Dr. Kuchynski found no joint swelling, no erythema, no ecchymosis, no deformity, no asymmetry, no increased warmth, no masses, no clicks, and no crepitus. (*Id.* at 951.) Dr. Kuchynski noted, "Sleep apnea probably contributing to most of her symptoms and the hope is that symptoms settle down with OSA treatment." (*Id.* at 952.) Dr. Kuchynski further noted Raynaud's was "active but stable." (*Id.*) Dr. Kuchynski determined Kauffman should hold off on chronic medication therapy for now, and that improved sleep and decreased fatigue should allow Kauffman to be more active and lose weight. (*Id.*) Dr. Kuchynski also reduced Kauffman's Lyrica dose, as the higher dose did not reduce her symptoms much. (*Id.*)

On May 24, 2019, Kauffman saw Samuel Rosenberg, M.D., for complaints of back and neck pain. (*Id.* at 1220, 1223.) Kauffman endorsed numbness of her fingertips and feet, as well as interscapular pain, along with low back pain, thoracic pain, intermittent leg pain, and bilateral groin pain. (*Id.* at 1220.) She denied dropping things and told Dr. Rosenberg that her balance was okay. (*Id.*) Dr. Rosenberg noted Kauffman had received chiropractic treatment "for years" and saw a rheumatologist at UH for possible connective tissue disease. (*Id.*) On examination, Dr. Rosenberg found intact motor and sensation of the upper and lower extremities, normal reflexes, negative straight leg raise test, and no pain with hip rotation. (*Id.* at 1222.) Kauffman's diagnoses consisted of cervical radicular pain and lumbar radicular pain. (*Id.*) Dr. Rosenberg instructed Kauffman to follow up with rheumatology. (*Id.* at 1223.)

On July 10, 2019, Kauffman saw Dr. Kuchynski for follow up and reported joint swelling, weakness, malaise, and Raynaud phenomenon. (*Id.* at 938.) Kauffman told Dr. Kuchynski she continued to have "overwhelming fatigue" despite OSA and ADHD treatment, and she was getting frustrated. (*Id.*) She

6

denied depression because she had the desire to do things. (*Id.*) Kauffman planned on seeing a gastroenterologist to ensure she did not have celiac. (*Id.*) Kauffman denied headaches. (*Id.*) Kauffman rated her pain as a 4/10 on average and a 6/10 at worst in the past week. (*Id.* at 939.) She endorsed a 30% reduction in pain in the past week and that the "amount of pain relief she is now obtaining from her current pain reliever(s) is enough to make a real difference in her life." (*Id.* at 939.) Kauffman reported her overall functioning was "better." (*Id.*) On examination, Dr. Kuchynski found no joint swelling, no erythema, no ecchymosis, no deformity, no increased warmth, no masses, no clicks, and no crepitus. (*Id.* at 942.) Dr. Kuchynski noted she would check Kauffman's vitamin levels and check her lab work for celiac. (*Id.* at 947.)

On November 1, 2019, Kauffman saw Dr. Kuchynski for follow up and reported she had been diagnosed with "'walking' pneumonia" that week and was on Z-pack. (*Id.* at 928.) Kauffman endorsed joint swelling, weakness, malaise, and Raynaud phenomenon. (*Id.*) Kauffman told Dr. Kuchynski she continued to have a lot of pain and had seen pain management after seeing a spine specialist. (*Id.*) Pain management suggested dry needling. (*Id.*) Kauffman also inquired about whether CBD oil would help. (*Id.*) Kauffman denied headaches. (*Id.*) She rated her pain as a 6/10 and told Dr. Kuchynski that treatment had relieved 10% of her pain in the past week. (*Id.* at 929.) Kauffman stated that "the amount of pain relief she is now obtaining from her current pain reliever(s) is enough to make a real difference in her life." (*Id.*) Kauffman reported improved mood and functioning. (*Id.*) On examination, Dr. Kuchynski found abnormal digits and nails, being positive for Raynaud's phenomenon, no joint swelling, active synovitis, scattered tender points, no increased warmth, no masses, no clicks, and no crepitus. (*Id.* at 932.) Dr. Kuchynski referred Kauffman for dry needling and advised Kauffman that CBD oil may increase the side effects of her current medications. (*Id.* at 936.)

On January 9, 2020, Kauffman saw Michael Harris, M.D., for follow up regarding her diffuse joint and muscle pain.  (*Id.* at 1243-44.)  Dr. Harris noted Kauffman had a diagnosis of fibromyalgia but may have some underlying problem as her "extensive lab work [came] back negative with the exception of a very mildly elevated CRP…."  (*Id.* at 1243.)  On examination, Dr. Harris found "diffuse myofascial tenderness," normal range of motion, and normal neurological findings.  (*Id.* at 1244.)  Dr. Harris' impression included fibromyalgia and "possibly some underlying connective tissue disorder, which is being worked up by Dr. Singer." (*Id.*)  Dr. Harris noted Kauffman was taking Lyrica and Topamax.  (*Id.*)

On April 30, 2020, Kauffman saw Dr. Harris via telehealth for follow up and reported "doing quite well, despite some major stressors, the least of which is COVID-19."  (*Id.* at 1249.)  Kauffman told Dr. Harris that she and her husband were separated, and she was moving to a new home with her three-year old. (*Id.*)  Kauffman endorsed continued diffuse myofascial pain in the right cervical region. (*Id.*)  She reported that chiropractic treatment and taking Lyrica and Topamax helped her pain.  (*Id.*)  Dr. Harris noted Kauffman still had diffuse myofascial tenderness with self-palpation but normal range of motion.  (*Id.* at 1250.)  Dr. Harris directed Kauffman to continue with Lyrica, Topamax, chiropractic treatment, and massage therapy.  (*Id.*)

On August 7, 2020, Kauffman saw Lauren Bockmuller, APRN-CNP, by telehealth for a COVID-19 evaluation.  (*Id.* at 369.)  Kauffman reported COVID-19 symptoms for the past four days that were getting worse.  (*Id.* at 370.) Her symptoms included chills/sweats, cough, nasal congestion, rhinorrhea, headache, sore throat, fatigue, and diarrhea.  (*Id.*)  Kauffman denied fever and shortness of breath.  (*Id.*)  She and a friend developed symptoms after visiting a restaurant and the mall.  (*Id.*)  She had also been at Virginia Beach the week before.  (*Id.*)  She wore a mask but went to a restaurant there.  (*Id.*)  Kauffman reported she had been tested for COVID at Metro, where she worked as a nurse practitioner, and it was negative.  (*Id.*) She told Bockmuller she was concerned that she had tested too soon from the onset of her symptoms.  (*Id.*)

8

Bockmuller diagnosed Kauffman with suspected COVID-19 infection and recommended COVID-19 testing and quarantine until symptom free.  (*Id.* at 372.)  Bockmuller told Kauffman she could return to work on August 14 if she had been symptom free for three days in a row.  (*Id.*)

On September 23, 2020, Kauffman saw Jacalyn Iacoboni, APRN-CNP, to establish care.  (*Id.* at 310.)  Kauffman reported a history of OSA and intolerance to a CPAP machine.  (*Id.*)  She told Iacoboni that she was using a mouthpiece, which helped, although she was getting up at night.  (*Id.*)  Kauffman endorsed worsening pain and a history of migraines, which had also been worse.  (*Id.*)  Iacoboni noted a questionable COVID diagnosis the month before, after which Kauffman had been experiencing chronic fatigue.  (*Id.*)  Kauffman reported taking Wellbutrin, Topamax, and Lyrica, as well as Concerta for ADHD and Provigil for excessive daytime sleepiness.  (*Id.*)  Kauffman also took Fioncet on occasion for her migraines.  (*Id.*)  She received monthly chiropractic treatment and monthly massage therapy.  (*Id.*)  Kauffman reported Lyrica helped her chronic pain somewhat.  (*Id.* at 314.)

On September 30, 2020, Kauffman saw neurologist Lisa Kurtz, M.D., for follow up of her daytime sleepiness and ADD/apraxia and reported doing better than she was at the beginning of the year.  (*Id.* at 283.)  She told Dr. Kurtz she was working from home, and she had her son four days a week and every weekend.  (*Id.*)  Kauffman stated she was attending weekly therapy sessions.  (*Id.*)  She found it hard to finish tasks, but she could go back to them.  (*Id.*)  Completing mental tasks had been difficult for her even before her COVID symptoms.  (*Id.*)

On December 7, 2020, Kauffman saw Dr. Kurtz for follow up and reported doing okay.  (*Id.* at 826.)  She told Dr. Kurtz that her work funding had been cut to 50%.  (*Id.*)  Kauffman stated she was "still very tired all the time."  (*Id.*)  She reported having a migraine the week before, as well as a slight fever, although her COVID test was negative.  (*Id.*)  Kauffman wanted to take a road trip, as she felt she needed a "reset" and some time away.  (*Id.*)  Kauffman told Dr. Kurtz she was doing well on Concerta but it wasn't helping

9

her energy levels.  (*Id.*)  Dr. Kurtz found no changes and stable findings on examination.  (*Id.*)  Dr. Kurtz noted Kauffman's fibromyalgia was stable.  (*Id.*)  Dr. Kurtz continued Concerta.  (*Id.*)

On January 4, 2021, Kauffman saw Chelsea Peticca, LPCC, LICDC, for counseling and reported that she had gone "camping on her own" and had "tak[en] time to enjoy nature."  (*Id.* at 841.)  Kauffman felt proud of herself "for doing this independently and stepping outside of her comfort zone in this way." (*Id.*)  Peticca noted they discussed Kauffman's transition to part-time work.  (*Id.*)  On examination, Peticca found Kauffman well-groomed, with cooperative attitude, normal speech, average eye contact, full affect, good general knowledge, and intact memory.  (*Id.*)  Peticca noted Kauffman had made good progress.  (*Id.*)

On June 24, 2021, Kauffman saw Dr. Kurtz for follow up and reported she had submitted her resignation and was working part-time until July 9th.  (*Id.* at 824.)  She was focused on her writing, photography, and art, and thought she might do freelance work and sell her photography.  (*Id.*)  Kauffman reported Provigil was working well.  (*Id.*)  Kauffman told Dr. Kurtz she had not been taking Concerta as much since she was working less; she took it on an as-needed basis and would take it if she had a deadline. (*Id.*)  Dr. Kurtz found no changes and a stable examination, and continued Kauffman's medications.  (*Id.*)

On August 16, 2021, Kauffman saw Peticca for counseling and reported "feeling 'blah' most days since leaving her job." (*Id.* at 871.)  She spent much of her day "gaming" and recognized this was a problem, as she was not as productive as she wanted to be.  (*Id.*)  On examination, Peticca found Kauffman well-groomed, with cooperative attitude, normal speech, average eye contact, constricted affect, good general knowledge, and intact memory.  (*Id.*)  Peticca noted Kauffman had made good progress.  (*Id.*)

On October 21, 2021, Kauffman saw Peticca for counseling and reported she had traveled to Arizona to visit her aunt and uncle, and the trip had gone well.  (*Id.* at 867.)  Peticca noted she helped Kauffman "with breaking down her priorities to prevent [her] from becoming overwhelmed and focus on one task at a time." (*Id.*)  They also discussed how to practice "discipline to stay on top of responsibilities as opposed to

10

falling behind." (*Id.*)  On examination, Peticca found Kauffman well-groomed, with cooperative attitude, normal speech, average eye contact, full affect, good general knowledge, and intact memory. (*Id.*)  Peticca noted Kauffman had made good progress. (*Id.*)

On January 6, 2022, Kauffman saw Peticca for counseling and reported "'doing well overall.'" (*Id.* at 862.)  She told Peticca she had made progress "with getting her blog and photography business together." (*Id.*)  Kauffman wanted to reduce the frequency of her counseling sessions because of her stability. (*Id.*)  On examination, Peticca found Kauffman well-groomed, with cooperative attitude, normal speech, average eye contact, full affect, good general knowledge, and intact memory. (*Id.*)  Peticca noted Kauffman had made good progress. (*Id.*)

On February 17, 2022, Kauffman saw Peticca for counseling and reported the trip she had taken with her son to Florida was "enjoyable and a needed opportunity to decompress." (*Id.* at 861.)  On examination, Peticca found Kauffman well-groomed, with cooperative attitude, normal speech, average eye contact, full affect, good general knowledge, and intact memory. (*Id.*)  Peticca noted Kauffman had made good progress. (*Id.*)

On November 18, 2022, Kauffman went to the emergency room with complaints of burning abdominal pain for the past 24 hours. (*Id.* at 337.)  Kauffman also endorsed a fever, occasional nausea without vomiting, and diarrhea. (*Id.*)  Movement worsened her pain, and only certain positions alleviated it. (*Id.*)  On examination, treatment providers found generalized abdominal tenderness and gaseous distension of the stomach. (*Id.* at 339, 341.)  Bloodwork revealed an elevated white blood cell count and an ultrasound showed an ovarian cyst. (*Id.* at 341.)  Treatment providers admitted Kauffman for observation. (*Id.* at 341-42.)  On November 19, 2022, Kauffman continued to have diffuse abdominal pain along with nausea. (*Id.* at 350.)  She had also developed heartburn. (*Id.*)  Treatment providers started Kauffman on

11

antibiotics and Protonix, which improved Kauffman's symptoms.  (*Id.* at 364.)  Kauffman asked to go home since she was feeling better, and treatment providers discharged her on November 20, 2022.  (*Id.*)

On December 7, 2022, Kauffman saw Nora Singer, M.D. for dysautonomia.  (*Id.* at 527-28.)  Dr. Singer noted Kauffman was applying for disability.  (*Id.* at 528.)  Kauffman reported some numbness and tingling, as well as "deadening" of her fingertips, that waxed and waned.  (*Id.*)  She also endorsed cold fingers and occasional pressure and pain in her torso.  (*Id.*)  She sometimes felt lightheaded when she exercised, especially when her heart rate increased.  (*Id.*)  Kauffman also reported restless leg syndrome. (*Id.*)  On examination, Dr. Singer found full range of motion of the neck, pain with lateral flexion of the neck, right worse than left, no synovitis and full range of motion of the joints, no tenderness, and negative metatarsal squeeze test.  (*Id.*)  Kauffman's diagnoses consisted of Raynaud's disease without gangrene, fibromyalgia, chronic midline thoracic back pain, and dysautonomia.  (*Id.* at 530.)  Dr. Singer ordered an autoimmune multiplex panel and spinal x-rays and prescribed Lyrica for Kauffman's fibromyalgia.  (*Id.*)

On February 2, 2023, Kauffman saw Gaurav Chenji, M.D., and Christopher Geiger, D.O., for evaluation for dysautonomia.  (*Id.* at 916.)  Drs. Chenji and Geiger reported that a tilt table test was negative, but they would continue to evaluate Kauffman's autonomic function by performing a battery of autonomic testing.  (*Id.*)  Drs. Chenji and Geiger found normal findings on examination.  (*Id.* at 917-21.)

On April 13, 2013, Kauffman saw Dr. Kuchynski for follow up and reported joint stiffness and generalized rash on her right forearm.  (*Id.* at 909-10.)  Kauffman told Dr. Kuchynski that a neurologist had diagnosed her with hyperadrenergic POTS.  (*Id.* at 910.)  On examination, Dr. Kuchynski found abnormal digits and nails with positive Raynaud's phenomenon, no joint swelling, scattered tender points, no erythema, no ecchymosis, no deformity, no increased warmth, no masses, and no clicks or crepitus.  (*Id.* at 914.)  Dr. Kuchynski's impression was UCTD and fibromyalgia complicated by POTS and noted that she

would check Kauffman's lab work to determine disease activity, especially in light of her recent rash.  (*Id.* at 910.)

On April 14, 2023, Kauffman saw Elizabeth Kaufman, M.D., for follow up of her "sinus tachycardia, especially with exertion, with dyspnea and lightheadedness."  (*Id.* at 709.)  Kauffman also endorsed brain fog, trouble sleeping, hypermobility, Raynaud's, and chronic pain.  (*Id.*)  Dr. Kaufman noted a tilt table test had revealed normal heart rate and blood pressure response to tilt.  (*Id.*)  An echocardiogram Dr. Kaufman ordered was normal.  (*Id.*)  Dr. Kaufman noted the following from a March 2022 treatment note: "'She had a week in Disney in January with lots of walking. Then it took her 1.5 weeks to recovery [sic] from the fatigue. She is trying to balance her exercise and her fatigue. She is not having much tachycardia or lightheadedness but does have brain fog. She pays attention to her hydration." (*Id.*)  Kauffman also showed elevated Lp(a) and Dr. Kaufman wanted to get her into a lipid clinic.  (*Id.*)  Dr. Kaufman noted that full autonomic testing revealed a diagnosis of hyperadrenergic POTS.  (*Id.*)  Kauffman reported a beta blocker was helpful, although she still got exhausted easily and had orthostatic dizziness.  (*Id.*)  Dr. Kaufman noted Kauffman was "working on children's book manuscripts."  (*Id.*)  On examination, Dr. Kaufman found slight edema on the left.  (*Id.* at 710.)

On July 13, 2023, Kauffman saw Theresa Poyma, PT, for a physical therapy session to address her right ankle sprain.  (*Id.* at 680.)  Kauffman reported "twinges" of pain in her ankle that could be caused by how she was walking.  (*Id.*)  Kauffman told Poyma that she wore her ankle brace most of the time and was full weight bearing.  (*Id.*)  Kauffman rated her pain as a 1/10 and reported some ankle stiffness that morning. (*Id.* at 681.)  She endorsed some increased pain after her last physical therapy session.  (*Id.*)  On examination, Poyma found reduced muscle strength and range of motion in the right ankle.  (*Id.* at 683.)

On July 27, 2023, Kauffman saw Kamal Chemali, M.D., for an evaluation of dysautonomia.  (*Id.* at 897, 899.)  Kauffman endorsed brain fog, fatigue, lightheadedness with standing and exertion, increased

13

sweat production, dry eyes, dry mouth, moderate to severe constipation, early satiety, and chronic joint and muscle pain.  (*Id.* at 897.)  Kauffman reported Propranolol helped reduce her daytime sleepiness and improved her cognition.  (*Id.* at 900.)  She told Dr. Chemali she forgot to take the lunchtime dose of her Propranolol despite setting reminders and alarms.  (*Id.*)  Dr. Chemali found normal findings on examination. (*Id.* at 906.)

On August 20, 2023, Dr. Geiger wrote a letter stating that Kauffman's symptoms had "worsened significantly in 2020 following a COVID-19 infection," and since then had risen "to a level that interferes with her day to day life."  (*Id.* at 1107.)  Autonomic testing conducted in March 2023 revealed orthostatic hypertension and hyperhidrosis.  (*Id.*)  Dr. Chemali had diagnosed Kauffman with dysautonomia.  (*Id.*)  Dr. Geiger opined, "to a reasonable degree of medical certainty, that Ms. Kauffman's dysautonomia was either exacerbated or directly caused by her COVID-19 infection in 2020."  (*Id.*)

## C.     State Agency Reports[4]

### 1.     Mental Impairments

On January 23, 2023, Kristen Haskins, Psy.D., reviewed the file and opined that there was "insufficient evidence through DLI."  (*Id.* at 95.)

On May 4, 2023, on reconsideration, Audrey Todd, Ph.D., affirmed Dr. Haskins' findings.  (*Id.* at 102-03.)

---

[4] As the ALJ noted in the decision: "[D]ue to the Field Office's errant submission of only the September 2020 DIB date last insured to the State agency Disability Determination Service, *i.e.,* and not the future Medicare insured coverage, neither of the two State agency medical consultants (MCs) and psychological consultants (PCs) had any meaningful period to consider for offering any administrative medical findings for the period of (then) alleged disability beginning months after the DIB date last insured on July 9, 2021 (*see* Ex. 2A/3,4; 4A/3,4-5 [technical "insufficient evidence" determinations rendered by both State agency MCs and PCs in January 2023 and April-May 2023])."  (Tr. 35.)

2.      **Physical Impairments**

On January 13, 2023, Obiaghanwa Ugbana, M.D., reviewed the file and opined that there was "insufficient evidence through DLI." (*Id.* at 94.)

On April 20, 2023, on reconsideration, Abraham Mikalov, M.D., affirmed Dr. Ugbana's findings. (*Id.* at 101.)

**D.      Hearing Testimony**

During the December 4, 2023 hearing, Kauffman testified to the following:

- She holds a driver's license. (*Id.* at 49.)  She lives with her six-year-old son half the time. (*Id.* at 50.)

- She takes Crestor, Effexor, Requip, Topamax, Valtrex, Vyvanse, Propranolol, and Wellbutrin. (*Id.* at 50-51.)  She takes Lyrica for "chronic pain and dyspareunia." (*Id.* at 50.)  She is being weaned off pantoprazole. (*Id.*)  She takes an "energy cocktail" consisting of CoQ10, vitamins B2, B1, and B12, Carnitine, and Creatine. (*Id.* at 51.)  She also takes Acidophilus, magnesium, and Tylenol arthritis strength. (*Id.*)  Her medications add to some of her fatigue and cause dry mouth. (*Id.*)

- She does not have problems sleeping at night. (*Id.*)  If she wakes up to change positions because of her pain, she falls back to sleep. (*Id.*)  Her OSA is "fairly well managed with the oral appliance" she uses nightly. (*Id.*)  She wakes up from pain most nights. (*Id.* at 52.)  She gets eight to nine hours of sleep a night. (*Id.*)  She naps most days. (*Id.*)

- Her hands get worse in the cold. (*Id.*)  She has small nerve neuropathy and Raynaud's. (*Id.*)  Humidity causes flares and her whole body swells. (*Id.*)  She also gets headaches. (*Id.* at 53.)

- She has "the structural abnormalities that go along with" MALS, but her doctors are unsure whether that's what is contributing to her recent hospitalizations. (*Id.*)  The pain, whether it's caused by MALS, IBS, or gastroparesis, is different from the pain caused by her connective tissue disease. (*Id.*)  The MALS pain comes and goes. (*Id.*)  There is no clear trigger. (*Id.* at 54.)  Her stomach problems cause bloating, diarrhea, and nausea. (*Id.* at 58.)  She has symptoms more than half the month. (*Id.* at 59.)

- Her connective tissue disease causes mostly neck and back pain, but some days are worse than others. (*Id.* at 55.)  Lyrica "minimally helps" her pain. (*Id.*)  On bad days, she uses ice, heat, and rest to help her pain. (*Id.*)  Certain positions, including sitting in certain positions and standing too long, exacerbate her pain. (*Id.*)  She is taking "pretty much" everything she can be for pain. (*Id.* at 56.)  She has had steroid injections in her hip and may have had them in her ankle. (*Id.* at 57.)

15

- Her doctors think she has both fibromyalgia and undifferentiated connected tissue disorder.  (*Id.* at 71.)

- She gets migraines every one to two months.  (*Id.* at 57.)  Weather changes and her menstrual cycle trigger them.  (*Id.*)  Her migraines cause nausea, light sensitivity, muscle "ickiness," and tiredness.  (*Id.*)  Her migraines usually last one to two days.  (*Id.*)  She takes extra Tylenol if she hasn't taken it, she will ice her head, and massage her muscles.  (*Id.*)  She cannot take NSAIDs because of gastritis.  (*Id.*)  Otherwise, she tries to sleep through it.  (*Id.*)

- Requip helps her restless leg syndrome.  (*Id.* at 59.)

- She cannot wash the dishes without having to sit down.  (*Id.* at 56.)  She must move her back when sitting.  (*Id.*)  If she cannot move her back, she can sit for 10 to 15 minutes.  (*Id.*)  She did not know how much she could lift without hurting herself, but she could not lift her son without hurting herself, and he is 50 pounds.  (*Id.*)

- A good day for her would be having enough energy to do laundry, clean the dirty dishes, and put away the clean dishes.  (*Id.* at 60-61.)  After that, she is "pretty much done" for the day and doesn't have any more energy.  (*Id.* at 61.)  If she overdoes it on a good day, she suffers for a week.  (*Id.*)  On a bad day, she can only get out of bed and feed the cats.  (*Id.*)  She doesn't even have energy to brush her teeth.  (*Id.*)  She just lays on the couch and uses her phone.  (*Id.*)  She cannot cook, clean, and do laundry all on the same day.  (*Id.* at 66.)  She can do those things separately.  (*Id.*)  She can go to the store by herself, but it "wipes [her] out for a couple days."  (*Id.* at 67.)  She visits her parents on the east side of Cleveland on a regular basis.  (*Id.*)

- She sees a counselor for her depression and anxiety.  (*Id.* at 61.)  She had been seeing her counselor every six months because she had been "pretty stable," but had messaged her counselor to try and get an earlier appointment.  (*Id.*)  Her depression is consistent with her stressors.  (*Id.* at 62.)  Her anxiety is high because she doesn't know what she is going to be able to do each day.  (*Id.*)  Being around new people makes her uncomfortable.  (*Id.*)  Her anxiety becomes a panic attack a couple times a year.  (*Id.* at 63.)  When she has a panic attack, her whole body feels like it's burning, she starts to sweat, and she gets a sense of depersonalization and déjà vu.  (*Id.*)

- She also has hyperadrenergic POTS. (*Id.* at 64.)  Whenever she stands up or sits up, her heart rate and blood pressure go up.  (*Id.*)  She starts to sweat more, which increases her anxiety.  (*Id.*)  This happens every time she gets up, but on a good day it's not noticeable.  (*Id.*)  On a bad day, she must stand there and wait a minute.  (*Id.* at 65.)  She has almost fallen.  (*Id.*)

- She had all the symptoms of COVID, even though she had a negative COVID test.  (*Id.*)

- She went to Florida in February 2022. (*Id.* at 67.)  She flew with her son and her parents.  (*Id.*)  They went to Disney.  (*Id.* at 68.)  She did a lot of walking and did "okay" when they were there, but when they came back, she felt sick and could not move or do much

for a week.  (*Id.*)  She flew to Arizona with her son in 2021 to visit her aunt and uncle.
(*Id.*)  She and her boyfriend go out sometimes but usually stay home.  (*Id.* at 69.)

- She gets leg cramps if she is on her feet too much or "walking any length of distance, especially if it's like any incline at all."  (*Id.* at 80.)  She sometimes gets leg cramps at night, but that's not as often.  (*Id.*)

During the hearing, Kauffman's significant other, Jeff Trzaska, testified to the following:

- He and Kauffman have been dating for two years.  (*Id.* at 74.)  Kauffman has canceled plans with him because of her symptoms.  (*Id.*)  Sometimes, he will go to her house instead of her going to his house.  (*Id.*)

- Kauffman has mental fog.  (*Id.* at 75.)  When she speaks, there will be gaps between her words.  (*Id.*)  If she is telling a story, she pauses for a long time and it's not just her searching for words; it's like her brain stops.  (*Id.*)  She has fatigue, so when they do things, they have to take breaks or plan them so she doesn't overexert herself.  (*Id.*) Otherwise, Kauffman is worn out for days or longer.  (*Id.*)  For example, they are in the process of cleaning out her garage, and one day Kauffman was just deciding what to keep, sell, or throw away.  (*Id.*)  She was worn out that day and the next, and she was not doing a lot of labor.  (*Id.*)  She was more fatigued than she should have been.  (*Id.*)

- The Saturday before the hearing, she woke up moaning in pain because her muscles had locked up.  (*Id.* at 76.)

- Kauffman can focus for a time, "but it seems to drop off quickly."  (*Id.* at 77-78.)  He thought her focus was decreased because of her issues.  (*Id.* at 78.)

- When they went to Virginia Beach, they knew Kauffman was going to get tired, so they would do something in the morning, eat lunch, and then Uber back to the hotel.  (*Id.*) Kauffman then rested for several hours, and she usually fell asleep.  (*Id.*)  She would not have been able to go out again that day.  (*Id.* at 79.)  When they went to Chicago, they had to stop twice when walking because Kauffman got leg cramps, and they had to take it easy the next day.  (*Id.*)

The VE testified Kauffman had past work as a nurse practitioner and registered nurse.  (*Id.* at 81.)

The ALJ then posed the following hypothetical question:

> For the hypothetical, Ms. Smith, consider please a younger individual born in 1987, with a high school education under the regulations.

> We're going to start out in the light range so for the first hypothetical, consider an individual that can lift, carry, push, and pull 20 pounds occasionally and ten frequently.  For this hypothetical, please considering [sic] sitting at six hours in a normal workday, standing, and walking at six hours in a normal workday.

17

The hypothetical individual cannot climb ladders, ropes, or scaffolds and can occasionally climb ramps and stairs, can frequently stoop, kneel, crouch, and crawl. The hypothetical individual is limited to simple routine tasks that involve no more than simple, work-related decision making.

The hypothetical individual is limited to occasional interaction with others that does not involve arbitration, negotiation, or confrontation. The hypothetical individual cannot direct the work of others and cannot be responsible for the safety or welfare of others. The hypothetical individual cannot perform assembly line work, or work that involves strict production quotas.

The hypothetical individual would be limited to occasional workplace changes that are gradual and explained in advance.

* * *

Would the nurse or the nurse practitioner jobs be available with those limitations?

(*Id.* at 82-83.)

The VE testified the hypothetical individual would not be able to perform Kauffman's past work as a nurse or nurse practitioner. (*Id.* at 83.) The VE further testified the hypothetical individual would be able to perform other representative jobs in the economy, such as mail clerk, price marker, and routing clerk. (*Id.*)

### III.   STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315, 404.1505(a).

A claimant is entitled to a POD only if the claimant: (1) had a disability; (2) was insured when the claimant became disabled; and (3) filed while the claimant was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

18

Eligibility for MQGE benefits is limited to certain categories of former Federal employees. 20 C.F.R. § 404.1018(b). The same sequential evaluation process applicable to disability insurance claims applies to MQCE claims. 42 U.S.C. § 426(b)(2)(C)(ii).

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. § 404.1520(a)(4). *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that they are not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. § 404.1520(b). Second, the claimant must show that they suffer from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. § 404.1520(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education, or work experience. *See* 20 C.F.R. § 404.1520(d). Fourth, if the claimant's impairment or combination of impairments does not prevent the claimant from doing their past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent the claimant from doing their past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c).

Here, Kauffman was insured on the amended alleged disability onset date, August 1, 2020, and remained insured through September 30, 2020, the date last insured ("DLI"), for purposes of her claim of POD and DIB under Title II. (Tr. 14-15.) Her date last insured for purposes of her MQGE claim is December 31, 2026. (*Id.* at 15.) Therefore, in order to be entitled to POD and DIB, Kauffman must establish

a continuous twelve-month period of disability commencing between these dates.  Any discontinuity in the twelve-month period precludes an entitlement to benefits.  *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV.  SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.  The claimant last met the insured status requirements of the Social Security Act for a period of disability and disability insurance benefits (Title II) on September 30, 2020.

2.  The claimant meets the insured status requirements of the Social Security Act for Medicare Part A health insurance coverage (Title XVIII) through December 31, 2026.

3.  The claimant has not engaged in substantial gainful activity since August 1, 2020, the amended alleged onset date (20 CFR 404.1571 et seq.).

4.  The claimant has the following severe impairments: undifferentiated connective tissue disease (UCTD), dysautonomia, median arcuate ligament syndrome (MALS), restless leg syndrome (RLS), and depressive disorder and anxiety disorder (20 CFR 404.1520(c)).

5.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, and 404.1526).

6.  After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work, as defined in 20 CFR 404.1567(b) and including the exertional abilities to lift and/or carry up to 20 pounds occasionally and up to 10 pounds frequently, to push and/or pull within those same weight limitations, and to sit, stand, and walk each (with normal breaks) for a total of about 6 hours in an 8-hour workday, except that she is further limited in the following nonexertional respects:

    - Cannot climb ladders, ropes, or scaffolds but can occasionally climb ramps and stairs, and can frequently stoop, crouch, kneel, and crawl; and

    - Can perform only simple, routine tasks that involve no more than simple workrelated decisionmaking, no assembly-line work, and no work involving strict production quotas; can have only occasional interaction with others that does not involve arbitration, negotiation, confrontation, directing the work of others, or being responsible for the safety or welfare of others; and can handle occasional workplace changes that are gradual and explained in advance.

7.      The claimant is unable to perform any past relevant work (20 CFR 404.1565).

8.      The claimant was born on July **, 1987 and was 33 years old, which is defined as a younger individual age 18-49, on the amended alleged disability onset date (20 CFR 404.1563).

9.      The claimant has at least a high school education (20 CFR 404.1564).

10.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (see SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

11.      Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569a).

12.      The claimant has not been under a disability, as defined in the Social Security Act, from August 1, 2020, the amended alleged onset date, through the date of this decision (20 CFR 404.1520(g))

(Tr. 17-37.)

## V.  STANDARD OF REVIEW

The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

21

Review of the Commissioner's decision must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.").  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-1300, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-cv-734,

22

2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10-CV-017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  ANALYSIS

In her complaint, Kauffman challenged the ALJ's Step Three finding and argued that "there is documentation of chronic severe fatigue, both mentally and physically and although the word malaise is not used specifically, the symptoms of malaise are documented."  (Doc. No. 1 at 5.)  In her brief, Kauffman corrected her argument and stated she "found many instances" of the term malaise in her medical records while preparing her brief, "even predating" her alleged onset date.  (Doc. No. 9 at 1-2.)  In her reply brief, Kauffman clarified her argument, maintaining that the ALJ erred "by failing to consider the multiple medical documents" that included malaise as a positive finding.  (Doc. No. 16 at 2.)  Kauffman asserts that, because of this error, "the ALJ failed to properly assess the severity of [her] UCTD, and that of the combination of both severe and non-severe impairments, in Step 3 of the 5-step sequential evaluation based on the alternative severity criterion of Listing 14.06 (20 CFR 404.P1, 20 CFR 404.1520(d), 404.1525, 404.1526, and 404.1509)."  (*Id.*)  She argues that "if the ALJ had known of the repeated malaise findings in the medical record in conjunction with severe fatigue that is both chronic and repeatedly manifests in flares of increased symptoms above the chronic baseline, he would have found my impairment or combination of impairments are of a severity to meet or medically equal the criteria of a listing, thus finding a favorable determination for disability at Step 3 and ending the evaluation process."  (*Id.*)

The Commissioner failed to respond to Kauffman's Step Three argument, and therefore, it is uncontroverted.  (Doc. No 14.)

At the third step in the disability evaluation process, a claimant will be found disabled if her impairment meets or equals one of the Listing of Impairments.  *See* 20 C.F.R. § 404.1520(a)(4)(iii); *Turner v. Comm'r of Soc. Sec.*, 381 F. App'x 488, 491 (6th Cir. 2010).  The Listing of Impairments, located at

Appendix 1 to Subpart P of the regulations, describes impairments the Social Security Administration considers to be "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. § 404.1525(a). Essentially, a claimant who meets the requirements of a Listed Impairment, as well as the durational requirement, will be deemed conclusively disabled and entitled to benefits.

Each listing specifies "the objective medical and other findings needed to satisfy the criteria of that listing." 20 C.F.R. § 404.1525(c)(3). It is the claimant's burden to bring forth evidence to establish that his impairments meet or are medically equivalent to a listed impairment. *See, e.g., Lett v. Colvin*, Case No. 1:13 CV 2517, 2015 WL 853425, at *15 (N.D. Ohio Feb. 26, 2015). A claimant must satisfy all of the criteria to "meet" the listing. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009). "An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990). A claimant is also disabled if her impairment is the medical equivalent of a listing, 20 C.F.R. § 404.1525(c)(5), which means it is "at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. § 404.1526(a).

Where the record raises a "substantial question" as to whether a claimant could qualify as disabled under a listing, an ALJ must compare the medical evidence with the requirements for listed impairments in considering whether the condition is equivalent in severity to the medical findings for any Listed Impairment. *See Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414-15 (6th Cir. 2011). In order to conduct a meaningful review, the ALJ must make sufficiently clear the reasons for her decision. *Id.* at 416-17. *See also Harvey v. Comm'r of Soc. Sec.*, No. 16–3266, 2017 WL 4216585, at *5 (6th Cir. March 6, 2017) ("In assessing whether a claimant meets a Listing, the ALJ must 'actually evaluate the evidence,' compare it to the requirements of the relevant Listing, and provide an 'explained conclusion, in order to facilitate meaningful judicial review.'" (quoting *Reynolds*, 424 F App'x. at 416); *Joseph v. Comm'r of Soc.*

24

*Sec.*, No. 17-4158, 2018 WL 3414141, at *4 (6th Cir. July 13, 2018) (same).   However, if the claimant does

not raise a "substantial question" as to whether a listing was met, by identifying specific evidence that

demonstrates a reasonable possibility that an impairment or combination of impairments met or medically

equaled the criteria of a listing – the ALJ's failure to evaluate that listing is not reversible error.  *Smith-*

*Johnson v. Comm'r of Soc. Sec.*, 579 F. App'x 426, 432-33 (6th Cir. 2014) (*citing Sullivan v. Zebley*, 493

U.S. 521, 530 (1990); *Sheek*s, 544 F. App'x at 641-42)).

> Listing 14.06 defines Undifferentiated and Mixed Connective Tissue Disease as follows:
>
> 5. Undifferentiated and mixed connective tissue disease (14.06).
>
> a. General. This listing includes syndromes with clinical and immunologic features of several autoimmune disorders, but which do not satisfy the criteria for any of the specific disorders described. For example, you may have clinical features of SLE and systemic vasculitis, and the serologic (blood test) findings of rheumatoid arthritis.
>
> b. Documentation of undifferentiated and mixed connective tissue disease. **Undifferentiated connective tissue disease is diagnosed when clinical features and serologic (blood test) findings, such as rheumatoid factor or antinuclear antibody (consistent with an autoimmune disorder) are present but do not satisfy the criteria for a specific disease.** Mixed connective tissue disease (MCTD) is diagnosed when clinical features and serologic findings of two or more autoimmune diseases overlap.

20 CFR Part 404, Subpart P, Appendix 1, Listing 14.00D5 (emphasis added). To satisfy the requirements

of Listing 14.06, a claimant must have undifferentiated or mixed connective tissue disease as described

above and the following:

> A. Involvement of two or more organs/body systems,[5] with:

---

[5] Examples of body systems include the following: "Musculoskeletal (heel enthesopathy), ophthalmologic (iridocyclitis, keratoconjunctivitis sicca, uveitis), pulmonary (pleuritis, pulmonary fibrosis or nodules, restrictive lung disease), cardiovascular (aortic valve insufficiency, arrhythmias, coronary arteritis, myocarditis, pericarditis, Raynaud's phenomenon, systemic vasculitis), renal (amyloidosis of the kidney), hematologic (chronic anemia, thrombocytopenia), neurologic (peripheral neuropathy, radiculopathy, spinal cord or cauda equina compression with sensory and motor loss), mental (cognitive dysfunction, poor memory), and immune system (Felty's syndrome (hypersplenism with compromised immune competence))."  20 CFR Part 404, Subpart P, Appendix 1, Listing 14.00D6(e)(iii).

> 1. One of the organs/body systems involved to at least a moderate level of severity; and
>
> 2. At least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss).
>
> or
>
> B. Repeated manifestations of undifferentiated or mixed connective tissue disease, with at least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss) and one of the following at the marked level:
>
> 1. Limitation of activities of daily living.
>
> 2. Limitation in maintaining social functioning.
>
> 3. Limitation in completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace.

20 CFR Part 404, Subpart P, Appendix 1, Listing 14.06.

Listing 14.00C2 defines constitutional symptoms or signs, as follows:

> 2. Constitutional symptoms or signs, as used in these listings, means severe fatigue, fever, malaise, or involuntary weight loss. Severe fatigue means a frequent sense of exhaustion that results in significantly reduced physical activity or mental function. Malaise means frequent feelings of illness, bodily discomfort, or lack of well-being that result in significantly reduced physical activity or mental function.

20 CFR Part 404, Subpart P, Appendix 1, Listing 14.00C2.

After finding that Kauffman's undifferentiated connective tissue disease constituted a severe impairment at Step Two (Tr. 19), the ALJ addressed Listing 14.06 at Step Three as follows:

> Generally, none of the claimant's own medical sources has indicated clinical findings on physical examinations or results of diagnostic laboratory testing that would satisfy the severity requirements of any listed impairment. In reaching the conclusion that the claimant does not have an impairment or combination of impairments that meets or medically equals a listed impairment, I considered all potentially applicable listed impairments but gave particular attention to the following most pertinent listing: 14.06, Undifferentiated and mixed connective tissue disease. However, the objective medical signs from physical examinations and the results of diagnostic laboratory testing in the record do not meet the specific criteria of this most directly applicable immune system disorders listing, and the evidence does not reasonably support a finding that

26

the claimant's impairments medically equal its criteria of that of any other listed impairment (SSR 17-2p).

More specifically, neither alternative severity criterion (A or B) of Listing 14.06 is met because of neither chronically experienced nor repeated manifestations of UCTD being associated with the requirement of at least two of the constitutional symptoms of severe fatigue, fever, malaise, and involuntary weight loss, with the latter three not reported in the medical evidence.

(Tr. 21-22.)

The Court finds the ALJ failed to sufficiently address whether Kauffman met the requirements of Listing 14.06. Although the ALJ acknowledges this Listing at Step Three, he fails to "'actually evaluate the evidence,'" compare it to the specific requirements of Listing 14.06, and provide an "'explained conclusion'" as to *why* the evidence failed to satisfy those requirements. *See Harvey*, 2017 WL 4216585, at *5; *Reynolds*, 424 F. App'x at 416. As Kauffman points out, the record is replete with references to malaise in the treatment records, spanning a period of at least six years and predating the amended alleged onset date. (Tr. 401-02, 917, 928, 938, 948, 953, 958, 964, 970, 977, 995, 1033, 1042, 1051, 1060, 1064, 1069, 1074, 1080, 1086, 1101.) Therefore, the ALJ's statement regarding malaise is incorrect, and malaise coupled with fatigue, another well-documented symptom in the medical record, would satisfy the listing criteria as to at least two of the enumerated constitutional symptoms.

As set forth above, Kauffman's Step Three argument is unopposed. However, the Court recognizes the Commissioner may argue harmless error at Step Three because the ALJ rejected claims of disabling fatigue in the RFC analysis.

In an analogous case, the Sixth Circuit rejected harmless error review in such a context as follows:

As in *Reynolds*, where we reversed and remanded a Listing claim to the ALJ for further consideration, the ALJ provided "no analysis whatsoever" as to whether Harvey's physical impairments met Listing 1.02, "despite his introduction concluding that they did not." *See Reynolds*, 424 Fed.Appx. at 415. This error was not harmless, because "if a person is found to meet a Listed Impairment, they are disabled within the meaning of the regulations and are entitled to benefits; no more analysis is necessary." *Id.* at 416 (citing 20 C.F.R. § 404.1520(a)(4)(iii)). Harvey suffered from knee pain from at least 2010, had

27

visited the emergency room on several occasions due to pain, swelling, and instability, was diagnosed with DJD, and had several surgeries, including four knee surgeries, to correct her problems. This evidence could support the criteria under Listing 1.02A.

Moreover, Harvey's testimony and some medical reports indicate that Harvey could not "effectively ambulate" as required under § 1.00B2b (cross-referenced in Listing 1.02B). This section calls for evidence that a person is "unable to ambulate effectively without a hand-held assistive device," and not "capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living." *See* Section 1.01B2b(2), Subpart P, app. 1 of Part 404 (2014). We do not decide whether the medical evidence and testimony support a finding that Harvey's treatments and symptoms meet the necessary criteria under Listing 1.02 because it is the ALJ's responsibility to at least address this question that Harvey raised and preserved throughout the administrative and judicial proceedings. Without this analysis, it is "impossible to say that the ALJ's decision at Step Three was supported by substantial evidence." *Reynolds*, 424 Fed.Appx. at 416.

In an attempt to fill this gap in the ALJ's analysis, the district court admitted that it "must look elsewhere in the opinion to determine if the ALJ sufficiently discussed the medical evidence as it relate[d] to the requirements in Listing 1.02." The district court determined that it was "clear from the ALJ's opinion that ... Plaintiff had moderate to severe DJD in both knees as shown by both x-rays and MRIs," and that Harvey had "consistent complaints of pain in both knees," meeting the first part of the criteria in Listing 1.02A. However, the court found that the evidence could not establish an "inability to ambulate effectively" because the ALJ had found that Harvey could extensively perform activities of daily living and had "full range of motion and normal strength in both knees" after her surgery.

**The district court should not have speculated what the ALJ may have concluded had he considered the medical evidence under the criteria in Listing 1.02.** *See Thomas v. Colvin*, 826 F.3d 953, 959 (7th Cir. 2016). This is so because, "in dealing with a determination ... which an administrative agency alone is authorized to make, [courts] must judge the propriety of such action solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis." *Chenery Corp.*, 332 U.S. at 196; *see also Simpson v. Comm'r of Soc. Sec.*, 344 Fed.Appx. 181, 192 (6th Cir. 2009).

Moreover, we will not apply a harmless error review to the ALJ's omission because the district court engaged in fact-finding to resolve this issue. *Chenery Corp.*, 332 U.S. at 196. When an ALJ fails to make a determinative and necessary finding of fact in a sequential step, a reviewing court should not "fill that gap." *See Getch v. Astrue*, 539 F.3d 473, 481 (7th Cir. 2008). Because the

28

> ALJ committed an error of law, we must vacate and remand, "even if the factual determinations are otherwise supported by substantial evidence and the outcome on remand is unlikely to be different." *Reynolds*, 424 Fed.Appx. at 414 (quoting *Kalmbach v. Comm'r of Soc. Sec.*, 409 Fed.Appx. 852, 859 (6th Cir. 2011)).

*Harvey*, 2017 WL 4216585, at **6–7 (emphasis added).

Even assuming, *arguendo*, that the ALJ's Step Three analysis satisfied the applicable legal requirements, the fact remains that because the ALJ incorrectly found no references to malaise in the treatment records, the ALJ failed to address Kauffman's malaise in the RFC analysis.  As the regulations make clear, malaise is a separate symptom from fatigue.  20 CFR Part 404, Subpart P, Appendix 1, Listing 14.00C2.  It is well established that the ALJ may not ignore or overlook contrary lines of evidence. *Fleischer*, 774 F. Supp. 2d at 880 (citing *Bryan v. Comm'r of Soc. Sec.*, 383 F. App'x 140, 148 (3d Cir. 2010) ("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual functional capacity determination,' and must also 'mention or refute [...] contradictory, objective medical evidence' presented to him.")).

For the foregoing reasons, the undersigned recommends that this case be remanded to provide the opportunity for the ALJ to provide an analysis of Kauffman's impairments under Listing 14.06 and proper evaluation of Kauffman's impairments and symptoms in the RFC analysis.

As the undersigned recommends remand on these grounds, and in the interest of judicial economy, the undersigned does not reach Kauffman's other assignments of error.  In addition, the undersigned recommends that the pending Motion to Supplement (Doc. No. 12) be DENIED AS MOOT.

## VII.   CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be VACATED AND REMANDED for further proceedings consistent with this opinion.

Date: February 17, 2026                           *s/ Jonathan Greenberg*
                                                  Jonathan D. Greenberg
                                                  United States Magistrate Judge


## OBJECTIONS

    **Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *Berkshire v. Beauvais*, 928 F.3d 520, 530-31 (6th Cir. 2019).**